(No. 4551— )

WHITLA C. MODGLIN, ADMINISTRATOR OF THE ESTATE OF CHARLES PHILLIP MODGLIN, DECEASED, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed January 12, 1954.*

R. W. HARRIS, Attorney for Claimant.

LATHAM CASTLE, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

FEARER, J.

On March 26, 1953, a claim was filed in this Court by Whitla C. Modglin, Administrator of the Estate of Charles Phillip Modglin, deceased, for the wrongful death of her infant son, Charles, as the result of his drowning in a fish and lily pond, located near the caretaker's home in the State Park at Dixon Springs, Illinois.

On October 26, 1951, Charles Phillip Modglin, an infant of approximately eight years of age, resided with his mother, father, brothers and sisters in the Village of Dixon Springs, County of Pope and State of Illinois. On said date Mr. and Mrs. Modglin owned and operated a general store, which also served as the post office for Dixon Springs, of which Mr. Modglin was the acting postmaster. At the same time, he was also employed in a plant at Paducah, and, during the time that he was away from the store and post office, which was between 6:00 A.M. and 4:00 P.M., the store and post office were tended by his wife.

The custodian of the State Park was Felix Burgess,

who lived in the custodian's house, located in the Park, with his wife. At the time of the accident he also had in his employ a Mr. V. L. Ditterline.

The custodian's house, near which the pool in question was located, is approximately 500 feet from the general store, where Mrs. Modglin last saw her son on the afternoon in question. There was testimony that, during the time she was working in the store and post office, she permitted the children, including Charles, to play in and about the store, and around the custodian's house. The testimony and the exhibits offered showed it to be a small concrete pool, irregularly shaped, approximately 15 feet long, $2\frac{1}{2}$ feet deep, and contained fish and lily pads. A small wooden bridge was constructed across the pool with two guard rails located on one side, and one guard rail located on the opposite side. There appears to be no question but what the pool was easily accessible, and was not guarded by a fence, or barricaded in any way; and that children were frequently seen playing around it. The custodian's yard and the pool were enclosed by woven wire and split rail fences. The entrance to the yard was through a woven wire gate. The enclosure, however, was not sufficient to keep people from entering the custodian's yard.

The evidence discloses that Charles Modglin was a boy of average height and weight for his age, had a defect in his speech, was physically handicapped, and was not at the time attending any school, but frequently visited the grades attended by his brothers and sisters.

Mrs. Modglin testified that, during the day when she was busy in the store, he was permitted to play in and around the store, and in the custodian's yard,

and had been seen on prior occasions playing around the fish pond. She was unable to state the hour when she last saw her son standing on the porch of the store, and didn't know his whereabouts on that day until she was notified that her son had been found submerged in the fish pond. She was present when Mr. E. L. Ditterline, an employee of the respondent, removed her son, who was sitting in an upright position, from the pond. A doctor was summoned immediately, and the doctor testified that the boy was dead when he first examined him, and that it was his opinion death was caused by drowning. The record is silent as to the boy playing around the pool, how he happened to fall into the pool, and whether anyone else was present at the time, as he was not seen from the time he left the store, until he was found submerged in the pool. There is no testimony other than the doctor's testimony as to how the boy met his death. However, we are of the opinion that he met his death by drowning.

Claimant contends it was the duty of the respondent to so maintain the fish pond that children of tender years would not have access to the yard in which the pond was located, and that the pool in question was an attractive nuisance, which would render the respondent liable for any injuries or damages sustained.

The only question confronting the Court is whether or not the fish and lily pond, located in the State Park, could be considered an attractive nuisance. We find that innumerable decisions have been rendered on this question, and in each case the determining factors were the location of the body of water, accessibility, attractiveness to children within the area, depth of the water, the size, the use made of the pond or body of water by

children, such as the skipping of stones, swimming, playing with boats, and its general overall use by children.

The pool, or body of water, that we have to consider in this case, might be found in any city park, privately owned property, or State park. It was not a pond, or body of water, the size or depth referred to in cases where the Court construed the body of water to be an attractive nuisance.

The most recent case we have found is *Gustafson* vs. *Consumers Sales Agency*, 414 Ill. 235. The defendant in this case owned premises, which it negligently failed to grade, permitting water to collect in the ravine to a depth of 15 feet in certain portions. The Court pointed out that there were sticks, logs and other objects on this artificial water course, which remained open and unguarded; and was located in a neighborhood thickly populated, and adjacent to a public street. It was proven that the defendant knew, or should have known, that children played in and around this pond, and played on it during the winter months, when it was frozen. The child referred to in this case was seven years of age, and met his death on January 14, 1950, when he fell through the ice, while playing on the pond.

The Court in this case was not called upon to decide the question of whether or not the body of water was an attractive nuisance, but was concerned with an amendment to the complaint in the Appellate Court, where the question first arose, to take care of an omission in the complaint as filed. However, since it was an attractive nuisance case, the Court discussed the question of whether or not an attractive nuisance was established by the evidence. In this regard, we

quote from a portion of the opinion, which is found on page 249:

"Although it is settled that an open body of water on private property is not in itself an attractive nuisance, (*Mindeman* vs. *Sanitary Dist.*, 317 Ill. 529; *Peers* vs. *Pierre*, 336 Ill. App. 134) nevertheless, where the water contained unusual attractive elements, such as a floating log (*McMahon* vs. *City of Pekin*, 154 Ill. 141), or a thick scum, which appeared like a path (*Cicero State Bank* vs. *Dolese & Shepard Co.*, 298 Ill. App. 290), or a boardwalk above the water (*Howard* vs. *City of Rockford*, 270 Ill. App. 155) the courts have held that the watercourse constituted an attractive nuisance."

In reading the cases cited in the opinion, it is apparent that, before a body of water or watercourse has been declared to be an attractive nuisance, the objects and conditions referred to in this opinion must be in existence, so that it would attract children of tender years, and if these conditions were not found, it was decided that an attractive nuisance did not exist, and, therefore, no liability.

The case of *Moore* vs. *North Chicago Refiners & Smelters, Inc.*, 346 Ill. App. 530, was one in which an infant, four years of age, was drowned in a pond of water on defendant's property. At the conclusion of the evidence offered in behalf of the plaintiff, the defendant made a motion for a directed verdict, which was sustained by the trial court. The Appellate Court of the Second District reversed the trial court, holding that the body of water in question was an attractive nuisance, and based its ruling upon the following facts: (1) The pond was approximately 15 feet wide, 200 feet long, located along the railroad right-of-way within a populated area. (2) Paths extended across the property upon which the pond was located, which were used by the public generally in visiting the pond. (3) There was a considerable amount of rubbish around and in the pond, and small rafts and other articles were seen floating in the water. The court held that there was

enough evidence introduced in regard to the pond, which made it a question of fact for the jury to pass on, and that the court should not have directed the verdict taking the case from the jury. In commenting on the evidence, or lack of evidence, as to whether or not the pond in question was an attractive nuisance as described by our Courts, we quote from page 533 of the opinion:

"Unguarded premises which are thus supplied with dangerous attractions are regarded as holding out implied invitations to such children. 'The owner of land where children are allowed or accustomed to play, particularly if it is unfenced, must use ordinary care to keep it in safe condition, for they, being without judgment and likely to be drawn by childish curiosity into places of danger, are not to be classed with trespassers, idlers and mere licensees.' *City of Pekin* vs. *McMahon*, 154 Ill. 141."

In the case of *Peers* vs. *Pierre*, 336 Ill. App. 134, the defendant owned ten acres of land in the Village of Skokie, Illinois. There was an excavation made on his property, and water, seeping therein through the gravel, formed a pond. The child in the case was seven years of age. The complaint was drawn on the attractive nuisance theory, alleging that the pond or body of water was located in a thickly populated neighborhood, wherein many small children lived and played, as there was a sand beach around the pond, and it was surrounded by hills. The complaint also alleged that the pond was visible, and accessible to all the children in the neighborhood. There was evidence the pond was not enclosed, and for a period of five years had been a place of amusement for many small children of tender years. At the close of plaintiff's evidence, the court directed a verdict finding the issues for the defendant. The plaintiff appealed from the judgment upon the verdict, and contended that there was enough evidence, viewed in its most favorable aspects to the plaintiff, for

the case to go to the jury; and, that it was a question of fact to be decided by the jury whether or not this particular body of water was an attractive nuisance. Defendant's position was that the evidence did not show he maintained a dangerous agency, such as to come within the attractive nuisance doctrine. The plaintiff proved that boys, older and younger than the decedent, habitually played in and about the pond; that there were stones and small sticks therein, and sticks were seen floating on the surface of the pond. Plaintiff also proved that boys swam therein, played boats, and, that a girl of tender years, who lived near the pond, almost drowned therein. It was also proved the defendant was notified of the habits of the children living in and about the pond. Evidence was also introduced to the effect that facing the road leading to the pond was a warning sign. However, the infant, who drowned, was not old enough to understand the meaning of the sign. Many cases are cited in this opinion, in some of which the court found an attractive nuisance did exist. We quote from page 138 of the opinion:

"We infer from a reading of these cases that the ponds or pools were not, in themselves, considered attractive nuisances. This inference is borne out by the cases in this and other jurisdictions cited by the defendant.

We are satisfied after reading *Mindeman* vs. *Sanitary District*, 317 Ill. 529; *Baker* vs. *Fruin-Colnon Construction Co.*, 271 Ill. App. 300; *Kelly* vs. *First Bank & Trust Co.*, 256 Ill. App. 439; and *Wood, Admr.* vs. *Consumers Co.*, 334 Ill. App. 530, that the pond in which the decedent, William Peers, was drowned was not an attractive nuisance. In the Mindeman case the court quoted extensively from *Barnhart* vs. *C. M. St. P. R. Co.*, 89 Wash. 304, 154 Pac. 441; where a boy 8 years old was drowned when he fell from a raft on the surface of a pool on the railroad property. The substance of the quotation is that there is a distinction between the so-called 'turntable' cases, and those involving pools of water; that no one can deny that a pool of water is attractive to boys, but that it is not a dangerous agency so as to come within the doctrine of attractive nuisances, because the number of deaths in comparison to the total number of boys visiting ponds for purposes of playing, fishing and swimming is comparatively small. The Washington Court in that case refused to go as far as our Supreme Court in *City of Pekin* vs. *McMahon*. We see no need of referring to other cases outside this jurisdiction. The weight of

authority is to the effect that the attractive nuisance doctrine does not apply to ponds, where there is no unusual danger. 36 A.L.R. 224. In the Mindeman case our Supreme Court said the courts seemed to be of one mind in holding that a canal pond or other open body of water is not of itself an attractive nuisance."

In all of the cases cited, and in others which we have read, we have not found one case wherein a state, municipality or an individual has been held liable for maintaining fish or lily ponds of the size and depth of the pond located in Dixon Springs State Park, and are of the opinion that this pond, even though unguarded, did not amount to an attractive nuisance.

For the reasons cited herein, we deny claimant's claim under the Injuries Act for the wrongful death of Charles Phillip Modglin.